**HAZARA ENTERPRISES, INC. and Hasan Kahn, Plaintiffs,**

v.

**MOTIVA ENTERPRISES, LLC, Shell Oil Company, and Petropac, Inc., Defendants.**

**No. 99–8568–CIV.**

United States District Court, S.D. Florida.

Dec. 21, 2000.

Barry S. Balmuth, West Palm Beach, FL, for Plaintiffs.

Samuel A. Danon, Hunton & Williams, Miami, FL, Nancy C. Banner, Holland & Knight, LLP, West Palm Beach, FL, for Defendants.

## ORDER ON DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

HURLEY, District Judge.

**THIS CAUSE** is before the Court upon the defendants Motiva Enterprises, LLC ("MOTIVA") and Shell Oil Company ("SHELL")'s motion to dismiss the plaintiff's Second Amended Complaint or in the alternative for summary judgment [DE# 73][1] in a case brought under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* ("PMPA" or "Act"). The gravamen of the Complaint is that Shell evaded a provision of the PMPA that requires service station franchisors like Shell to offer assignment of lease options to their franchisees before terminating the franchise relationship. 15 U.S.C. § 2802(c)(4)(B).

### I. FACTUAL BACKGROUND

In 1959 defendant Shell leased property for the operation of a gas station on Lake Worth Road in Lake Worth, Florida from Mary Kerskine for a primary term of 15 years, ending November 24, 1974. Upon expiration of the original lease term, Shell had options to extend the ground lease for two additional periods of five years each. On May 17, 1982, Shell and Kathleen Erskine Leutze (successor in interest to Mary Erskine) entered an Agreement Amending Lease providing Shell with options to extend the ground lease for four additional five year periods.

In February 1994, Shell entered into a franchise agreement with DME Gas Services Inc. through execution of a written Dealer Agreement and Motor Fuel Station Lease (collectively "dealer documents"). The Dealer Agreement covers Shell's sale of Shell brand motor fuel and other products to the franchisee, while the Lease covers control and use of the service station property, equipment and improvements. On November 15, 1994, Hazara obtained the Shell franchise by assignment from DME. On that date, Shell and Hasan

Khan, Hazara's President and sole owner, executed a Consent to Assignment Agreement, and Khan signed a personal guaranty covering all indebtedness incurred by Hazara to Shell for rent and the purchase of Shell petroleum products and other merchandise.

On September 14, 1998, Shell exercised the fourth and final remaining option to extend the ground lease, extending the term through calendar year 2004. Approximately two weeks later, on October 1, 1998, Shell assigned its interest in the ground lease, due to expire in 2004, as well as its interest in the dealer agreement and station lease, due to expire on January 31, 1999, to Motiva, a joint venture petroleum company owned by Shell, Texaco and Saudi Refining, Inc.

Motiva, in turn, advised Hazara by letter dated December 30, 1998 that it intended to extend the station lease and dealer agreement though the earliest of (1) December 31, 1999; (2) execution of a new Dealer Agreement and Station Lease; or (3) the effective date of a notice of nonrenewal.

Just over a month later, on February 3, 1999, Motiva voluntarily terminated the underlying Leutze ground lease effective November 30, 1999 pursuant to a lease term authorizing cancellation upon 180 days notice. Shortly thereafter, on April 8, 1999, Motiva verbally advised Hazara that it did not intend to renew its franchise agreement effective November 30, 1999 due to its cancellation of the underlying ground lease, and followed up with written confirmation of this decision on April 21 and July 26, 1999. Hazara thereafter attempted to negotiate a new lease directly from the landowner, but was not able to accomplish this until November 20, 1999, when it executed a new lease with Leutze providing for a monthly rental payment of $4500/month, a substantial increase from the $1500/month previously paid by Shell under the prior leasehold.

---

1. Also pending is the defendants' related motion for summary judgment [DE# 61] directed toward an earlier version of the plaintiffs' complaint.

Shortly after it thus regained a right of possession to the marketing premises, on December 13, 1999, Hazara asked Motiva to sell the underground fuel lines and storage tanks to it, but Motiva refused. Instead, following a hearing before the Magistrate Judge on the parties' cross motions for preliminary injunctive relief relating to removal of this equipment from the marketing premises and a related ruling in favor of Motiva, the defendants retained Petropac Inc., to enter the property and remove the tanks and lines.

Hazara now operates a gas station on the original marketing premises under the Marathon brand name.

## II. CLAIMS AND COUNTERCLAIMS

On July 20, 1999, Hazara and Khan filed this action against Shell and Motiva alleging violations of the Petroleum Marketing Practices Act[2] as well as state law claims for breach of oral contract, negligent misrepresentation and estoppel.

On the PMPA claims, plaintiffs allege that Motiva violated 15 U.S.C. § 2804(c)(4)(B) by neglecting to offer Hazara an assignment of the remainder of the underlying ground lease when it decided to terminate the franchise relationship based on expiration of the ground lease (Count I). In addition, plaintiffs allege that Motiva violated § 2804(c)(4)(C)[3] by failing to offer to sell, transfer, or assign Motiva's interest in underground fuel storage tanks, lines, fuel pumps and other equipment located on the premises when it terminated its franchise relationship with Hazara. (Count II).

Plaintiffs also raise state law claims for breach of oral contract (Count IV), negli-

gent misrepresentation (Count V), and promissory estoppel (Count VI), alleging that Shell fraudulently induced Hazara to enter into the franchise agreements by misrepresenting that it intended to expand the station facility with addition of a convenience store in the near future, and that it intended to continue indefinitely a variable rent program which allowed for rent fluctuations based on the amount of "Shell" branded gasoline products sold at the station. In addition, plaintiffs assert negligence claims against Motiva and Petropac, Inc., a company retained by Motiva to remove underground storage tanks and lines from the station property following termination of the puncture of one of the underground storage tanks and consequent contamination of the station property, as well as damage to the asphalt curbing, landscaping and irrigation systems located on the station property. (Count III).

Defendants Shell and Motiva deny any liability under the PMPA, contending that Motiva had no obligation to offer an assignment of its interest in the underlying ground lease to Hazara at the time it decided not to renew the franchise agreement because it did not possess an "option to extend" the underlying lease contemplated by 15 U.S.C. § 2802(c)(4)(B) at that time. As to the franchisee's requested sale of the underground storage tanks and fuel lines, defendants maintain that these issues were conclusively resolved by an earlier order of the court adopting the Magistrate Judge's recommendation to grant preliminary injunctive relief to defendants which allowed the defendants to remove the equipment, finding

2. The PMPA allows a franchisee to bring a civil action against a franchisor in any situation where the franchisor fails to adhere to the standards and procedures governing termination or nonrenewal of a franchise agreement. 15 U.S.C. § 2805(a).

3. 15 U.S.C. § 2802(c)(4)(C) provides that a franchisor may terminate a franchise agreement because of the loss of the franchisor's right to grant possession because of the expiration of the underlying lease, if:

a. in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession (...by obtaining a new lease), the franchisor...

i. made a bona fide offer to sell, transfer, or assign to the franchisee the interest of franchisor in any improvement of equipment located on the premises....

§ 2802(c)(4)(B) no impediment to the removal on ground that the equipment in question was potentially dangerous, and on ground that the franchisee's request to purchase the equipment was untimely.

Finally, these defendants lodge counterclaim against plaintiffs for $34,911.48 allegedly due under the dealer documents for rent, gas and other Shell products purchased by Hazara during its operation of the franchise.

As to the state law claims, defendants argue that any alleged oral misrepresentations made prior to Hazara's execution of the Consent to Assignment Agreement are unenforceable as a matter of law under the doctrine of merger and by force of an integration clause contained in that Agreement, which provides:

> This Consent to Assignment Agreement contains the complete agreement of the parties...and the parties respectively declare that no conflicting or additional representations have been made by or to such party with reference to such assignment...

Defendants also invoke the integration clause contained in Dealer Agreement[4] and Lease Agreement[5] which Hazara accepted by assignment in support of its merger and integration defense to the contract claims.

## III. DISCUSSION

### A. PMPA Claims

Motiva concedes that its relationship with Hazara is a franchise relationship covered by the PMPA. Therefore, the limited issue presented on the statutory claims is whether Motiva violated the PMPA when it failed to renew Hazara's franchise agreement without first offering to assign its interest in the underlying ground lease to Hazara at that time (Count I) or when it refused to offer to assign its interest in the underground tanks and fuel lines located on the leased premises to Hazara when it obtained a new lease from Leutze in November of 1999. (Count II)

Congress enacted the PMPA in 1978 in large part because it was concerned that franchisors had been using their superior bargaining power to compel compliance with certain marketing policies and to gain an unfair advantage in contract disputes. *Patel v. Sun Co., Inc.,* 141 F.3d 447 (3d Cir.1998); *Hutchens v. Eli Roberts Oil Co.,* 838 F.2d 1138 (11th Cir.1988). In particular, Congress sought to protect petroleum franchisees from franchisors' "arbitrary or discriminatory terminations or non-renewals." *Id., citing* Senate Report No. 731, 95th Cong.2d Sess. 17–19, reprinted in 1978 U.S.C.C.A.N. 873, 875–77. Toward these ends, the Act sets forth the circumstances under which a franchisor may terminate or decide not to renew a franchise and imposes certain notice requirements. 15 U.S.C. § 2804. *Shukla v. BP Exploration & Oil Inc.,* 115 F.3d 849, 852 (11th Cir.1997). It also enumerates a series of grounds that permit a franchisor to terminate or nonrenew without PMPA liability, 15 U.S.C. § 2802(b) and (b)(3), which may be viewed as falling into the two broad categories of franchisee misconduct and legitimate franchisor business decisions.

Acceptable business reasons for franchisee termination or nonrenewal include the franchisor's decision to leave the geographic market area, *see* § 2802(b)(2)(E);

---

**4.** This clause provides:

> This agreement along with any related agreement(s) which may be executed contemporaneously herewith, comprises the entire agreement, and merges and supersedes all prior agreements, understandings, representations and warranties (oral or written, expressed or implied), between Shell and Dealer covering the sale and delivery of Shell products. All such prior agreements between Shell and Dealer are hereby terminated as of the effective date hereof....

**5.** This clause provides:

> This Lease terminates, as of its effective date, any prior lease by Shell to Lessee of the Premises, and merges and supersedes all prior representations and agreements, and constitutes the entire contract between Shell and Lessee concerning the subject matter...

failure of the franchisor and franchisee to agree in good faith and in the normal course of business to changes or additions to the franchise agreement, *see* § 2802(b)(3)(A); conversion of the property to a use other than sale of motor fuel, *see* § 2802(b)(3)(D)(i)(I); material alteration of the property, *see* § 2802(b)(3)(D)(i)(II); sale of the premises, *see* § 2802(b)(3)(D)(i)(III); unprofitability of the franchise, see § 2802(b)(3)(D)(i)(IV); loss of an underlying lease, *see* § 2802(b)(2)(C) [incorporating § 2802(c)(4) ]; and loss of franchisor's right to grant the trademark which is the subject of the franchise, *see* § 2802(b)(2)(C)[incorporating 2802(c)(6) ].

It is the loss of underlying lease exception which is at issue in this action. This exception derives from 15 U.S.C. § 2802(b)(2)(C) which provides that a franchisor may terminate or decline to renew a franchise agreement upon:

> The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first

acquired actual or constructive knowledge of such occurrence

> (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

> (ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

15 U.S.C. § 2802(c), in turn, enumerates a nonexclusive list of events that qualify as "relevant" within the meaning of this section. Included in this list is the "expiration of underlying lease" exception:

> *loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if*—during the 90 day period after notification was given pursuant to section 2804 of this title, *franchisor offers to assign to the franchisee any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor. . . .* [6]

15 U.S.C. § 2802(c)(4)(B). (emphasis supplied).[7]

---

**6.** The statute does allow the franchisor to condition the assignment upon its receipt of:

(i) an unconditional release executed by both the landowner and the franchisee releasing the franchisor from any and all liability accruing after the date of the assignment for—

(I) financial obligations under the option (or the resulting extended lease or purchase agreement);

(II) environmental contamination to (or originating from) the marketing premises; or

(III) the operation or condition of the marketing premises; and

(ii) an instrument executed by both the landowner and the franchisee that ensures the franchisor and the contractors of the franchisor reasonable access to the marketing premises for the purpose of testing for and remediating any environmental contamination that may be present at the premises...

Hazara here maintains that the landowner was prepared to execute such a release for the

benefit of the franchisor. However, the court does not find the release issue pertinent to disposition of the pending motion because Motiva never offered to assign a lease interest of any kind to the franchisee, conditional or otherwise. Moreover, Motiva does not contend that its inability to secure a release of liability within the contemplation of this contingency rendered its nonrenewal decision "reasonable" for purposes of avoiding PMPA liability. It never reaches this issue because it maintains that the right of first refusal requirement was never triggered in the first instance on the theory it did not hold an "option to extend" the underlying lease when it made its decision to nonrenew the franchise.

**7.** The right of first refusal memorialized in this section was added by 1994 amendment to the Act. See PMPA amendments of 1994, Pub.L. No. 103–371, sec. 3, s. 102(c)(4), 108 Stat. 3484 (codified at 15 U.S.C. at 2802(c)(4)(B)(West Supp.1996)).

Hazara contends that Motiva violated this section by failing to first offer to assign its interest in the remaining term of the underlying ground lease to Hazara when it decided to terminate their franchise relationship, creating economic waste by forcing Haraza to negotiate a less favorable lease of the station property directly with Leutze. Motiva, on the other hand, argues that its termination of the underlying lease constitutes a statutorily authorized reason for non renewal under 2802(c)(4)(B), and that it was not required to first offer to assign its remaining interest in the ground lease to Hazara under this section because this interest is not properly characterized as an "option to extend" an underlying lease within the meaning of the statutory exception.

Prior to the 1994 Amendment to the Act, the expiration of lease exception was broadly interpreted by the Courts to allow for nonrenewal even where the franchisor's right to grant possession of the leased marketing premises was lost due to a voluntary act of the franchisor, such as affirmative failure to renew the underlying lease, *see Veracka v. Shell*, 655 F.2d 445 (1st Cir.1981), or the franchisor's voluntary relinquishment of the lease in midterm. *See Hutchens v. Eli Roberts Oil Co.*, 838 F.2d 1138 (11th Cir.1988) (rejecting argument that voluntary cancellation of the underlying lease cannot constitute "[t]he occurrence of an event" under section 2802(b)(2)(C)). In *Hutchens*, the court found no meaningful distinction between an affirmative failure to exercise an option to extend an underlying lease, as in *Veracka*, or the voluntary cancellation of a lease in mid term, as in *Hutchens*, for purposes of establishing a permissible terminating event under 2802(c)(4):

> Hutchens contends that *Veracka* and the line of cases following it are distinguishable in that they involve the expiration rather than the cancellation of an underlying lease. He argues that although a franchisor's decision to allow its underlying lease to expire may be an event that justifies nonrenewable of a franchise, its decision to cancel the lease in the middle

of its term is not. We disagree. The distinction Hutchens urges is arbitrary and finds no support in the purpose of legislative history of the PMPA. As long as the franchisor's decision to relinquish its lease is an arms length transaction in which it actually gives up control over the premises, it makes no difference whether the relinquishment is accomplished through cancellation of the lease or a decision not to renew it.

*Hutchens*, 838 F.2d at 1141–1142 n. 1.

■ Since *Hutchens* and *Veracka* both pre-date the 1994 Amendment to the PMPA, which added the right of first refusal requirement, they may be of questionable continued vitality, although at least one court has since reaffirmed *Veracka*'s underlying rationale, i.e. that a voluntary loss of lease is a proper event making termination of a franchise reasonable under section § 2802(c)(4). *See PDV Midwest Refining LLC v. Armada Oil & Gas Co., Inc.*, 116 F.Supp.2d 835 (E.D.Mich. 1999). In this case, however, plaintiff does not challenge the franchisor's right to nonrenew the franchise agreement based on its voluntary termination of the underlying ground lease; rather the question it poses is whether the franchisor's concomitant failure to offer to assign the balance or remaining term of the existing ground lease (approximately five years) at the time it decided to nonrenew the franchise rendered its nonrenewal decision "unreasonable" within the meaning of the Act.

Stated another way, the question presented—apparently one of first impression—is whether voluntary loss of the underlying lease still qualifies as a reasonable basis for termination of a franchise under the 1994 Amendment to the Act where the franchisor holds a right to continue possession of the leased marketing premises through a fixed future date (but does not hold a contractual right or option to "extend" the lease beyond that scheduled expiration date), yet fails to offer to assign this interest in continued possession to its franchisee when it decides to lapse the lease and terminate or

nonrenew the franchise relationship on that basis.

Motiva takes the position that because it had already exercised its last available option to extend the underlying ground lease for last five year term by the time it decided not to renew its franchise agreement with Hazara, it did not hold an "option to extend" the underlying lease within the meaning of the Act at that time which it was obligated to offer to assign to its franchisee. Hazara, on the other hand, urges a more liberal interpretation of the phrase "any option to extend the underlying lease," arguing that Motiva's ability to continue the lease through November 30, 2004, was tantamount to an "option to extend" the lease through that time, and that Motiva accordingly had an obligation under the Act to offer to assign this interest to Hazara when it decided not to renew the franchise relationship. In support of this broader interpretation, plaintiff cites to the legislative history of the PMPA, House Report 103–737: "Section 4 makes clear that, where the franchisor has an option to continue a lease .... but does not wish to do so, the franchisor must offer to assign the option to the franchisee." H.R. 103–737, 103rd Cong., 2d Sess. (emphasis added). U.S.Code Cong. & Admin. News 2780 (1994).

■■■ Guided by the precept that the Act must be liberally construed to effect its overriding remedial purposes, *Seckler v. Star Enterprise,* 124 F.3d 1399 (11th Cir.1997); *May–Som Gulf Inc. v. Chevron USA,* 869 F.2d 917 (6th Cir.1989), the court concludes that an "option to extend" an underlying ground lease is logically interpreted to subsume an "option to continue" the underlying lease through a primary or extended scheduled future expiration date. This is the most logical interpretation of this phrase which best effectuates the Act's overriding remedial purpose of protecting the franchisee from arbitrary or discriminatory acts of the franchisor. To interpret this clause oth-

erwise in the restricted fashion urged by defendants would permit the franchisor to arbitrarily forfeit its remaining interest in an existing leasehold without offering to assign this benefit to its franchisor upon the termination of their relationship where the underlying lease had a fixed future expiration date with no additional extension options, while it would be required to offer to assign its interest in continuing the underlying lease where it did hold an option to further extend the lease past its scheduled expiration date. The Court will not adopt an interpretation of the Act which would foster such arbitrary conduct on the part of the franchisor and the economic waste it is apt to engender.

Therefore, the court concludes that an option to continue an existing leasehold is an "option to extend the underlying lease" for purposes of 2802(c)(4)(B) of the PMPA, and accordingly finds that plaintiff has demonstrated the existence of a genuine material fact as to whether Shell/Motiva could refuse to renew the franchise without liability based on the loss of lease exception codified at § 2802(b)(2)(C) and 2802(c)(4)(B) of the Act. The Court will therefore deny defendants' motion for summary judgment as to Count I of plaintiffs' Second Amended Complaint.

As to the PMPA claim asserted at Count II of the Complaint, the Court observes that it previously issued a preliminary injunction, upon recommendation of the Magistrate Judge Lynch, enjoining plaintiffs from interfering with Motiva's removal of Motiva equipment from the station premises. This ruling was premised, *inter alia,* upon the Court's preliminary finding that the underground storage tank system located at the marketing premises was in "potentially dangerous" condition, and its conclusion that the PMPA does not require a terminating franchiser to include potentially hazardous underground storage tank systems in any "bona fide" offer to sell under 15 U.S.C. § 2802(c)(4)(C).[8] Having

---

**8.** Additionally, the Court earlier adopted the Magistrate's finding that plaintiffs failed to

properly invoke Section 2802(c)(4)(C) of the PMPA because they did not make a written

previously found the existing systems at the station premises to fall within this category based upon proofs offered at the evidentiary hearing held upon the application for preliminary injunctive relief, and finding no additional proofs submitted upon this issue by the plaintiffs which would create a genuine issue of material fact upon this question, the Court concludes that defendants are entitled to summary judgment on the PMPA claim asserted in Count II of the complaint.

### B. State Law Claims

■ Hazara alleges that it was induced to accept the assignment of the former franchisee's dealer documents based on oral misrepresentations made by Shell. In particular, Hazara alleges that Shell representatives Jerry Pellino and Steven Schorr told Khan that "variable rent" program would always be in existence, and that Shell intended to expand the station facility with a convenience store in the near future. Hazara claims Shell made these statements in order to induce his acceptance of the franchise assignment, and that Hazara justifiably relied on these representations when he accepted the assignment of the former franchisee's dealer documents. Because Shell ultimately elected not to expand the facility and to discontinue the variable rent program, plaintiffs now assert claims for breach of oral contract, negligent misrepresentation and promissory estoppel against Shell and Motiva.

Motiva argues that Hazara is precluded as a matter of law from asserting any claim based on the alleged oral representations made prior to execution of the Consent to Assignment Agreement by operation of the doctrine of merger and the contract integration clause, which in conjunction with the parole evidence rule, preclude reference to the alleged prior or contemporaneous oral representations in interpreting the terms of the written contract, *citing Johnson Enterprises of Jacksonville Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1309 (11th Cir.1998); *Chase Manhattan Bank v. Rood*, 698 F.2d 435, 436 (11th Cir.1983).

■ Under Florida law, the parol evidence rule precludes admission of prior or contemporaneous oral statements which vary or contradict the terms of a written contract which is clear, unambiguous and fully integrated. *Ungerleider v. Gordon*, 214 F.3d 1279 (11th Cir.2000); *Ali R. Ghahramani, M.D. P.A. v. Pablo A. Guzman M.D. P.A.*, 768 So.2d 535 (Fla.App. 4th DCA 2000). In this case, Shell's alleged oral assurances do vary or contradict the express terms of plaintiff's written dealer documents, and would appear to fall within the penumbra of this rule: By letter agreement captioned "Consent to Assignment Agreement" dated November 2, 1994, Shell consented to assignment of the dealer agreement and station lease from DME, the former franchisee, to Hazara. Shell's consent was subject to several terms and conditions, including plaintiff's agreement to be bound by the dealer documents and to accept all of DME's rights and obligations under those documents. The dealer documents, in turn, provide for a fixed—not variable—rent schedule, and

---

request for an offer to sell the equipment, including the underground storage tank system, until December 13, 1999, which was not within thirty days of the April 21, 1999 notice ·of termination of the franchise relationship which Motiva issued to Hazara. After reviewing the parties' respective memoranda submitted in conjunction with this summary judgment proceeding, and hearing argument of counsel upon these issues, the court has revisited this issue and concludes that there is at least an issue of fact as to the timeliness of Hazara's request to purchase the equipment because, as Hazara points out, it did not

obtain a new lease on the marketing premises at the same time it was notified of the termination of the franchise relationship(April of 1999), raising a query as to whether it acquired possession of the premises "effective immediately after the loss of the right of the franchisor to grant possession" within the meaning of section 28802(c)(4)(C) on November 29, 1999, triggering the 30 day notification request provision of the statute at that time. However, this is a moot point at this juncture in light of the alternative finding regarding the potential dangerousness of the equipment.

do not provide for expansion of the facility with a convenience store. Further, both the dealer documents and Consent to Assignment contain integration clauses, indicating that the documents represent the complete and final agreement of the parties.

Hazara challenges application of the parol evidence rule to the dealer documents which it accepted by assignment from DME, arguing that the parole evidence rule has no application to interpretation of the dealer documents because the alleged oral representations that induced its acceptance of the assignment were made after—not before execution of the dealer documents to which it was not a party. In addition, it argues that the parole evidence rule does not preclude admission of a contemporaneous oral agreement which induces execution of a written contract, citing *Florida Pottery Stores v. American Nat. Bank,* 578 So.2d 801 (Fla. 1st DCA 1991); *Furlong v. First National Bank of Hialeah,* 329 So.2d 406 (Fla. 3d DCA 1976). *See also First National Bank of lake Park v. Gay,* 694 So.2d 784 (Fla. App.4th DCA 1997).

The Court rejects Hazara's first argument, because Hazara assumed all rights and obligations of DME, the predecessor franchisee, when it accepted the assignment, which would include an obligation to be bound by the integration clause of the dealer documents. In addition, the Assignment Agreement by which Hazara assumed these obligations itself contains an integration clause, plainly putting Hazara on notice that the terms of the franchise relationship would be exclusively controlled by the terms of the written contract between the parties.

█ Plaintiffs' challenge to application of Florida's parole evidence rule under the asserted "inducement" exception similarly is without merit. *See Ungerleider v. Gordon, 214 F.3d 1279 (11th Cir.2000)(* inducement exception to parol evidence rule requires oral agreement to be shown by evidence that is clear, precise and indubitable); *Chase Manhattan Bank v. Rood,*

698 F.2d 435 (11th Cir.1983)(rejecting application of inducement exception to support admission of uncorroborated self serving testimony to establish an alleged oral agreement). Accordingly, the court will enter summary judgment in favor of defendants on the breach of oral contract claim (Count IV). *See Anheuser–Busch, Inc. v. Jefferson Distributing Co.,* 353 F.2d 956 (5th Cir.1965); *Seaway Yacht Sales, Inc. v. Brunswick Corporation,* 242 So.2d 192 (Fla. 3d DCA 1970).

█ Finally, the Court concludes that the negligent misrepresentation and promissory estoppel claims are legally insufficient. It is deemed unreasonable as a matter of law to rely upon oral statements, even if falsely made, where a written contract subsequently executed does not contain the alleged representations. *Schubot v. McDonalds Corp.,* 757 F.Supp. 1351, 1356 (S.D.Fla.1990), *citing 3 P.M. Inc. v. Basic Four Corp.,* 591 F.Supp. 1350, 1367 (E.D.Mich.1984) and *Rosenberg v. Pillsbury Co.,* 718 F.Supp. 1146, 1152 (S.D.N.Y. 1989). *See also General Motors Acceptance Corp. v. Marlar,* 761 F.2d 1517, 1520 (11th Cir.1985)(recognizing fraud in inducement, duress and mistake as falling outside prohibition of parol evidence rule, but finding that Florida did not recognize party's asserted right to rely on alleged misrepresentations where he had opportunity to examine contents of note which he made).

In this case, the subsequently executed Consent to Assignment Agreement entered by Hazara and Shell clearly and unequivocally did not provide for expansion of the convenience store nor did it provide for "variable rent" based on the amount of Shell branded gas products sold at the station. Instead, it defined Hazara's rights and obligations by reference to those of the former franchisee existing under the dealer documents, which likewise did not provide for expansion of the station facility or a variable rent program. Under these circumstances, it was unreasonable as a matter of law for Hazara to

rely on the alleged oral representations made prior to execution of the Assignment Agreement, and the Court will accordingly enter summary judgment in favor of defendant on Counts V (negligent misrepresentation) and VI (promissory estoppel) of the plaintiffs' Complaint. *See Flight Concepts Ltd. Partnership v. Boeing Co.,* 819 F.Supp. 1535 (D.Kan.1993); *Saunders Leasing System, Inc. v Gulf Cent. Distrib. Center, Inc.,* 513 So.2d 1303, 1306–1307 (Fla. 2d DCA 1987).

Based on the foregoing, it is accordingly:

**ORDERED and ADJUDGED:**

1. The defendants' motion to dismiss or in the alternative for summary judgment [DE# 73] as to the PMPA claim contained in **Count I** of the plaintiff's Second Amended Complaint is **DENIED;**

2. The defendants' motion to dismiss or in the alternative for summary judgment [DE# 73] as to the PMPA claim contained in **Count II** of the plaintiff's Second Amended Complaint is **GRANTED;**

3. The defendants' motion to dismiss or in the alternative for summary judgment [DE# 73] as to the state law claims set forth in **Counts IV, V and VI** of the plaintiff's Second Amended Complaint is **GRANTED.**

4. The defendants' motion to dismiss or in the alternative for summary judgment on their counterclaims against plaintiffs [DE# 73] is **DENIED.**

5. The defendant's motion for summary judgment directed to a prior version of the plaintiff's complaint [DE# 61] is **DENIED AS MOOT.**

6. The defendants' motion for leave to later file an additional substantive motion directed to the negligence claim asserted in **Count III** of the plaintiff's second amended complaint is **DENIED.**